[Cite as *State ex rel. Luken v. Corp. for Findlay Mkt. of Cincinnati*, 2012-Ohio-2074.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | CASE NO. C-100437 |
| EX REL. KEVIN P. LUKEN, | | |
| | : | |
| Relator, | | *O P I N I O N.* |
| | : | |
| vs. | | |
| | : | |
| CORPORATION FOR | | |
| FINDLAY MARKET OF CINCINNATI, | : | |
| | | |
| and | : | |
| | | |
| CITY OF CINCINNATI, | : | |
| | | |
| Respondents. | : | |

Original Action in Mandamus

Judgment of the Court:  Writ Denied

Date of Judgment Entry:  May 11, 2012

*Kevin P. Luken*, for Relator,

*Rendigs, Fry, Kiely & Dennis, LLP, Felix J. Gora* and *Ann K. Schooley*, for Respondent Corporation for Findlay Market of Cincinnati,

*John P. Curp*, City Solicitor, and *Terrance Nestor*, Assistant City Solicitor, for Respondent City of Cincinnati.

Please note:  This case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1}     In this original action, relator Kevin Luken has petitioned for a writ of mandamus to compel the respondents—the Corporation for Findlay Market of Cincinnati ("CFMC") and the city of Cincinnati—to provide certain records concerning Findlay Market under the Ohio Public Records Act, R.C. 149.43.  Findlay Market is a public market located in the Over-the-Rhine neighborhood of Cincinnati.  The city leases the property comprising the market to CFMC, which manages and operates the market under an exclusive agreement with the city.

{¶2}     The records at issue are license agreements between CFMC and merchants for retail space at Findlay Market.  The license agreements are essentially commercial subleases.  Luken has received copies of the license agreements; however, their term and rent provisions have been redacted.  CFMC maintains that it is not subject to R.C. 149.43 because the nonprofit corporation is neither a public office under the functional-equivalency test of *State ex rel. Oriana House, Inc. v. Montgomery*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, nor a person responsible for public records under *State ex rel. Cincinnati Enquirer v. Krings*, 93 Ohio St.3d 654, 758 N.E.2d 1135 (2001).  CFMC further argues that the redacted provisions are trade secrets under the Ohio Uniform Trade Secrets Act, R.C. 1333.61 et seq., and therefore not public records under *State ex rel. Besser v. Ohio State Univ.*, 87 Ohio St.3d 535, 721 N.E.2d 1044 (2000).

{¶3}     We referred this matter to a magistrate for trial under App.R. 34(A).  Following trial, the magistrate prepared a decision denying the writ.  Luken has filed amended objections to the magistrate's decision; therefore, we must now "undertake an independent review as to the objected matters to ascertain that the magistrate has

properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d); App.R. 34(C). We, therefore, review the magistrate's decision de novo with respect to fact and law. *See Azarova v. Schmitt*, 1st Dist. No. C-060090, 2007-Ohio-653, ¶ 32.

### *Factual Background*

{¶4}   Having repeatedly, thoroughly, and independently reviewed the record, we find the following facts.

{¶5}   Findlay Market has served the people of Cincinnati since the 1850s. Before July 2004, the city managed the market under the Cincinnati Municipal Code, which authorizes the city manager to designate a market manager to make operational decisions for the market. Cincinnati Municipal Code 845-3.

{¶6}   In August 2003, at the city's request, U-B Corporation incorporated CFMC as an Ohio nonprofit corporation "to preserve and promote the historical, traditional, and cultural aspects of Findlay Market as a treasured living landmark of the greater Cincinnati community." Jt. Ex. 1. To advance this purpose, the articles of incorporation granted CFMC the powers to

> d)   Secure and maintain a lease and/or management contract with the City of Cincinnati for city-owned facilities located in the Findlay Market District of the Over-the-Rhine neighborhood * * *
>
> e) Sublease appropriate space to merchants, social service agencies, and community groups to support community economic development and educational and cultural activities in the Findlay Market District of the Over-the-Rhine neighborhood * * * [and]

3

g) Work with appropriate City of Cincinnati officials whose jurisdiction includes City property and public market concerns. Jt. Ex. 1.

{¶7} On July 1, 2004, CFMC entered into a management agreement and lease agreement with the city. These agreements were renewed on June 8, 2009, and remain in effect until July 1, 2014. Under the management agreement, CFMC has the exclusive right to manage and operate Findlay Market. CFMC may establish "such rules and regulations as CFMC deems in its discretion to be reasonable and proper concerning Market Operations." Jt. Ex. 2. Indeed, CFMC maintains day-to-day control over the market.

{¶8} Section 6(a) of the management agreement provides that

The City assigns its rights under existing contracts with subtenants at the Market to [CFMC]. [CFMC] shall enter into license or lease agreements with existing and new subtenants regarding occupying space in the Market and the Market Facilities. [CFMC] shall have the discretion to determine the amounts of consideration to be paid, and the responsibility for collecting those amounts and using the revenues to pay for Market Operations. *Id.*

{¶9} Section 6(e) provides that

[CFMC] shall maintain a complete set of books and records in a form and manner approved by the City, showing all revenue collected and all expenditures made in connection with the cooperation of the Market Facilities along with such supporting data and documents as

prescribed by the City. Such books and records shall be kept in such a manner as to make them easily reconcilable with the reports and forms to be submitted to the City by [CFMC]. The City shall have the right at any time to examine the records, books, data and documents kept by [CFMC] regarding the operation and maintenance of the Market Facilities. *Id.*

{¶10}   In addition, Section 5 requires the city to reimburse CFMC for certain expenses incurred in operating the market. These reimbursements totaled 45.4 percent of CFMC's revenue in the fiscal year ending June 30, 2010, and 31.2 percent in the fiscal year ending June 30, 2009.

{¶11}   In April 2010, Luken requested CFMC to provide various records under R.C. 149.43, including "[a]ll leases, license agreements or any other agreements the Corporation has with any person or entity that leases, licenses, uses or occupies any space managed by the Corporation since January 1, 2009." Jt. Ex. 8. CFMC claimed that it was not subject to R.C. 149.43, and advised Luken to obtain the records from the city. In May 2010, Luken asked the city to request the records from CFMC under Section 6(e) of the management agreement, and to provide him with any records it received.

{¶12}   There is no dispute that the city provided Luken with the records that CFMC produced, including two redacted license agreements for retail space at the market. There is also no dispute that the redactions obscure the term and rent provisions of those agreements. There is a dispute, however, as to whether these provisions are trade secrets.

**{¶13}** Robert Pickford, the president and chief executive officer of CFMC, testified that CFMC maintains an unwritten policy to keep the license agreements confidential. Pickford claimed that CFMC keeps the license agreements in a locked cabinet, and does not "share the information to anyone who doesn't absolutely have to have it." T.p. 251. Although Pickford maintained that the term and rent provisions are not shared with the city despite Section 6(e) of the management agreement, he conceded that in May 2009 he had sent city officials a memorandum detailing negotiations between CFMC and one merchant for a license agreement. He also admitted that in September 2006 he had sent Luken's brother—a Findlay Market merchant— a letter describing the method for setting the rent provisions in his license agreement. Pickford explained that CFMC has since transitioned away from formulaic rent calculations, and has adopted a market-oriented approach.

**{¶14}** Commercial real estate expert Karman Stahl testified that the release of the term and price provisions would place CFMC at a competitive disadvantage in negotiating with current and prospective merchants. Stahl maintained that such information is generally kept secret by commercial landlords, and that competitors in the commercial real estate market spend "a lot of time looking for that information." T.p. 314. "If everybody knew when everybody's leases were expiring," she explained, "we would just pursue their tenants and try to pull them out of their building at the time * * * right before their lease expired." *Id.* When asked whether keeping the term and price provisions confidential provides an economic benefit to the landlord or property manager, Stahl replied, "Definitely." T.p. 322.

### *The Magistrate's Decision and Luken's Objections*

**{¶15}** Following trial, the magistrate prepared a decision denying the writ, concluding that the redacted provisions are trade secrets and, therefore, exempt from

6

disclosure under R.C. 149.43(A)(1)(v). *See Besser*, 87 Ohio St.3d at 540, 721 N.E.2d 1044. The magistrate further decided that CFMC is not subject to mandamus under R.C. 149.43 because the private entity is neither a "public office" under the functional-equivalency test of *Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, nor a "person responsible for public records" under *Krings*, 93 Ohio St.3d 654, 758 N.E.2d 1135.

{¶16} Luken has filed eight amended objections to the magistrate's decision. The first three concern whether CFMC is a "public office," the fourth challenges the magistrate's application of *Krings*, and the last four regard whether the redacted provisions are trade secrets.

### Analysis

{¶17} The Ohio Public Records Act provides that upon request, "all public records responsive to the request shall be promptly prepared and made available for inspection to any person at all reasonable times during regular business hours." R.C. 149.43(B)(1). A person allegedly aggrieved by the failure to make a public record available "may commence a mandamus action to obtain a judgment that orders the public office or person responsible for the public record to comply with [R.C. 149.43(B)] * * * ." R.C. 149.43(C)(1). "In order to be entitled to a writ of mandamus, the relator must establish a clear legal right to the relief prayed for, that respondent has a clear legal duty to perform the requested act, and that relator has no plain and adequate remedy at law." *State ex rel. Seikbert v. Wilkinson*, 69 Ohio St.3d 489, 490, 633 N.E.2d 1128 (1994). Relators seeking public records in mandamus, however, need not establish the lack of an adequate remedy at law. *State ex rel. Am. Civ. Liberties Union of Ohio, Inc. v. Cuyahoga Cty. Bd. of Commrs.*, 128 Ohio St.3d 256, 2011-Ohio-625, 943 N.E.2d 553, ¶ 24.

**{¶18}** Because the city has provided Luken with the records in its possession, we hold that a mandamus judgment against the city would be improper. *See State ex rel. Striker v. Smith*, 129 Ohio St.3d 168, 2011-Ohio-2878, 950 N.E.2d 952, ¶ 28. Our analysis, therefore, focuses on whether CFMC is a public office or a person responsible for public records, and whether the requested records are exempt from disclosure as trade secrets.

*CFMC is not a Public Office*

**{¶19}** " 'Public office' includes any state agency, public institution, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). In *Oriana House*, 110 Ohio St.3d 456, 2006-Ohio-4854, 854 N.E.2d 193, the Ohio Supreme Court considered how to determine whether a private entity qualifies as a "public institution" under R.C. 149.011(A), and thus a "public office" for purposes of R.C. 149.43. The court adopted the so-called "functional-equivalency test," under which courts "must analyze all pertinent factors, including (1) whether the entity performs a governmental function, (2) the level of government funding, (3) the extent of government involvement or regulation, and (4) whether the entity was created by the government or to avoid the requirements of the Public Records Act." *Id.* at paragraph two of the syllabus. Although the court acknowledged that R.C. 149.43 should be liberally construed, with any doubt resolved in favor of disclosure, it further held that "the functional-equivalency analysis begins with the presumption that private entities are not subject to the Public Records Act absent a showing by clear and convincing evidence that the private entity is the functional equivalent of a public office." *Id.* at ¶ 15 and ¶ 26.

8

{¶20} In considering the *Oriana House* factors, the magistrate determined that (1) CFMC does not perform a governmental function, (2) CFMC receives significant government funding, (3) government involvement in CFMC is limited, and (4) CFMC was neither created by the government nor to avoid the requirements of R.C. 149.43. The magistrate concluded that on balance, there was not clear and convincing evidence that CFMC is a public office.

{¶21} In his first amended objection, Luken argues that CFMC performs a government function. He cites the fact that Findlay Market was managed by the city for over 150 years. This court, however, interprets "governmental function" in this context not as activities that the government has performed, but rather as activities that are uniquely governmental. *Compare State ex rel. Repository v. Nova Behavioral Health, Inc.*, 112 Ohio St.3d 338, 2006-Ohio-6713, 859 N.E.2d 936, ¶ 30 (providing mental-health care for the uninsured and compensating for the inadequacy of benefits in commercial health-insurance plan "is uniquely a government function"); *Oriana House* at ¶ 28 (administering a community-based correctional facility is a government function); *with State ex rel. Bell v. Brooks*, 130 Ohio St.3d 87, 2011-Ohio-4897, 955 N.E.2d 987, ¶ 22 (providing insurance to counties is not a government function); *State ex rel. Dist. Eight Regional Organizing Commt. v. Cincinnati-Hamilton Cty. Community Action Agency*, 192 Ohio App.3d 553, 2011-Ohio-312, 949 N.E.2d 1022, ¶ 9-10 (1st. Dist.) (providing home weatherization and energy-efficiency services to low-income individuals is not a government function).

{¶22} We hold that the management and operation of a public market, an activity ubiquitously performed by nongovernmental entities, is not a governmental function. The first amended objection is overruled.

**{¶23}** In his second amended objection, Luken argues that the city is actively involved in the management of Findlay Market. "In addressing the question of the extent of government involvement or regulation, the Ohio Supreme Court has looked to the control over day-to-day operations of an entity." *Dist. Eight Regional Organizing Commt.* at ¶ 12; *see Oriana House* at ¶ 33.

**{¶24}** Under the management agreement, CFMC has the right to create rules and regulations for Findlay Market, and moreover, to "determine the amounts of consideration to be paid, and the responsibility for collecting those amounts and using the revenues to pay for Market Operations." Although the city retains some rights under the management agreement and lease agreement, we cannot say that it controls the day-to-day operations of CFMC. The second amended objection is overruled.

**{¶25}** In his third amended objection, Luken argues that CFMC was created by the city. Because the city requested the creation of a nonprofit corporation to manage and operate Findlay Market, we agree and find that the city created CFMC. Although there is no indication that CFMC was created or used by the city to avoid the requirements of R.C. 149.43, we must sustain the third amended objection.

**{¶26}** We further agree with the magistrate's conclusion that the city's funding of CFMC —which totaled nearly half of its revenue in the fiscal year ending June 30, 2010—is not just significant, but overwhelming.

**{¶27}** Nevertheless, based on all the relevant factors, we conclude that on balance, Luken has not demonstrated by clear and convincing evidence that CFMC is a public institution under the *Oriana House* functional-equivalency test. The nonprofit corporation is, therefore, not a public office under R.C. 149.43.

*CFMC is a Person Responsible for Public Records*

**{¶28}** In his fourth amended objection, Luken essentially argues that the magistrate incorrectly determined that CFMC is not a person responsible for public records and, therefore, is not subject to mandamus under R.C. 149.43. "In order for a private entity to be subject to R.C. 149.43, (1) it must prepare the records in order to carry out a public office's responsibilities, (2) the public office must be able to monitor the private entity's performance, and (3) the public office must have access to the records for this purpose." *Krings*, 93 Ohio St.3d at 657, 758 N.E.2d 1135.

**{¶29}** In *Krings*, Hamilton County and the city of Cincinnati entered into an agreement for the construction of a new football stadium for the Cincinnati Bengals. In the agreement, the county and the city specified that they had "determined that the construction of the new Stadium on the Cincinnati riverfront will create an extraordinary opportunity to eliminate blight and transform the riverfront into a nucleus of economic development and to make the Riverfront an integral part of a redeveloped downtown Cincinnati." *Id.* at 655. Pursuant to statutory authority, the board of county commissioners contracted with two private companies to construct the stadium. *Id.* at 658. "In these contracts, [the construction companies] were obligated to prepare records related to construction costs for the publicly funded stadium, the board [of county commissioners] and the county had the right to monitor their performance under the contracts, and the board was authorized to access records in order to monitor their performance." *Id.*

**{¶30}** The Cincinnati Enquirer petitioned for a writ of mandamus to compel the county administrator and the two construction companies to provide correspondence relating to cost overruns for the stadium project, including internal business records.

11

{¶31}   The Ohio Supreme Court held that mandamus was proper against the companies, recognizing that they were constructing the stadium on behalf of the county, which was authorized by law to build it. *See* R.C. 307.023. Otherwise, the court concluded, "a private entity performing a government contract that obligates it to act to further the best interest of the governmental entity could prepare records concerning massive cost overruns and fail to divulge these records to the public office unless the office specifically requested the records." *Id.* at 559.

{¶32}   Although the city has turned over the reins of management to CFMC, it has not abdicated its responsibility to Findlay Market. After all, the city still owns the property comprising the market, funds a huge percentage of the operation, and clearly desires its continued operation. In addition, under Section 6(a) of the management agreement, the city has required CFMC to enter into license agreements with merchants for space at the market. Meanwhile Section 6(e) of the management agreement requires CFMC to

> maintain a complete set of books and records in a form and manner approved by the City, showing all revenue collected and all expenditures made in connection with the cooperation of the Market Facilities along with such supporting data and documents as prescribed by the City.
>
> Jt. Ex. 2.

{¶33}   Under the same provision, the city has the "right at any time to examine the records, books, data and documents kept by [CFMC] regarding the operation and maintenance of the Market Facilities." *Id.* Accordingly, we hold that the license agreements are created to carry out the city's responsibilities, the city is able to monitor CFMC's performance, and the city has access to the license agreements, under the

12

management agreement, for this purpose. We, therefore, sustain the fourth amended objection.

*The Trade Secrets Exception*

{¶34}   Although we hold that the *Krings* test has been satisfied, Luken is not necessarily entitled to unredacted copies of the license agreements. These records must also be "public records" if they are to be recoverable under R.C. 149.43. In his fifth, sixth, seventh, and eighth amended objections, Luken challenges the magistrate's conclusion that the records at issue are, by definition, not public records.

{¶35}   Under R.C. 149.43(A)(1), "public record" is defined generally as any record "kept by any public office * * * ." The statute exempts from this definition, however, several categories of records, including those records "the release of which is prohibited by state or federal law." R.C. 149.43(A)(1)(v). "Exemptions to disclosure must be strictly construed against the custodian of public records, and the burden to establish an exception is on the custodian." *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 376-377, 662 N.E.2d 334 (1996).

{¶36}   The Ohio Supreme Court has held that trade secrets—as defined by the Ohio Uniform Trade Secrets Act, R.C. 1333.61 et seq.—are exempt from disclosure under R.C. 149.43 because their release is prohibited by state law. *Besser*, 87 Ohio St.3d at 540, 721 N.E.2d 1044. R.C. 1333.61(D) defines "trade secret" as

> information * * * that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

13

(2) It is the subject of efforts that are reasonable under

the circumstances to maintain its secrecy.

{¶37} "The question whether a particular knowledge or process is a trade secret is * * * a question of fact to be determined by the trier of fact upon the greater weight of the evidence." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 181, 707 N.E.2d 853 (1999).

{¶38} In this case, the redacted term and rent provisions of the license agreements are subject to a confidentiality policy, and are not shared with the city, despite the city's right under Section 6(e) of the management agreement "to examine the records, books, data and documents kept by [CFMC] regarding the operation and maintenance of the Market Facilities." Although there is evidence that city officials received a memorandum detailing the negotiations for a license agreement between CFMC and one merchant at Findlay Market, this disclosure was reasonable, given the city's unique relationship with CFMC. Thus, under the circumstances, we find that CFMC has taken reasonable efforts to keep the redacted provisions secret.

{¶39} We further find that the confidentiality of these provisions provides CFMC with a competitive advantage in negotiating with current and prospective employees, thus, an economic benefit. The term and rent provisions of the license agreements are, therefore, trade secrets under R.C. 1333.61(D). *See Ohio Consumers' Counsel v. Pub. Util. Comm. of Ohio*, 121 Ohio St.3d 362, 2009-Ohio-604, 904 N.E.2d 853 (holding that the public utilities commission had reasonably concluded that termination dates and consideration paid in side agreements were trade secrets); *accord Hymen Cos. v. Brozost*, 119 F.Supp.2d 499 (E.D.Pa. 2000). We, therefore, overrule the fifth, sixth, seventh, and eighth amended objections.

### *Conclusion*

**{¶40}** Although we hold that the *Krings* test has been satisfied, because the records at issue are trade secrets as defined by R.C. 1333.61(D), they are exempt from disclosure under R.C. 149.43(A)(1)(v). *See Besser*, 87 Ohio St.3d at 540, 721 N.E.2d 1044. The third and fourth amended objections are sustained, and the remaining amended objections are overruled. The magistrate's decision is adopted as modified, and the writ of mandamus is denied.

### *Attorney Fees*

**{¶41}** Luken has also requested attorney fees for pursuing this action. Because we have determined that he is not entitled to the requested writ of mandamus, we deny his request for attorney fees. *State ex rel. Cincinnati Enquirer v. Streicher*, 1st Dist. No. C-100820, 2011-Ohio-4498, ¶ 34. The parties and their counsel in this case have performed admirably and acted reasonably in light of the circumstances, and thus an award of attorney fees would not be proper.

Writ denied.

**HILDEBRANDT, P.J.,** and **SUNDERMANN, J.,** concur.

Please note:
The court has recorded its own entry this date.